Alejandro Pinto (*pro se*)

PO Box 811512

Boca Raton, Florida 33481-1512

(561) 365-8936

alej.xyz1@gmail.com

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| ALEJANDRO PINTO, | ) | |
| Plaintiff, | ) | |
| v. | ) | **COMPLAINT** |
| BLOCKFI INC., | ) | |
| Defendant. | ) | |

---

Plaintiff, Alejandro Pinto, brings this complaint against Defendant, BlockFi Inc., and respectfully alleges upon personal knowledge and information and belief, as follows:

### NATURE OF ACTION

1.      Plaintiff, Alejandro Pinto, has initiated this action to address violations by Defendant, BlockFi Inc. ("**BlockFi**"), of Title VII of the Civil Rights Act of 1964 ("**Title VII**"—42 U.S.C. §§ 2000e, *et seq.*), Section 1981 of the Civil Rights Act of 1866 ("**Section 1981**"—42 U.S.C. § 1981), New York State Human Rights Law under New York State Executive Law Article 15, § 290, *et seq.* ("**NYS HRL**"), and New York City Human Rights Law under New York City

Administrative Code § 8-107(4), *et seq.* ("**NYC HRL**"). As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages and other equitable remedies set forth herein.

## PARTIES

2.      Plaintiff Alejandro Pinto is a resident of Boca Raton, Florida, and has been so since June 2021. Between September 2016 and May 2021, and at all relevant times for this action, Mr. Pinto was a resident of New York, New York.

3.      Defendant BlockFi is a corporation organized under the laws of Delaware with its principal place of business in Jersey City, New Jersey. BlockFi is a secured non-bank lender that offers cryptocurrency-backed U.S. dollar loans to cryptocurrency owners and accepts deposits of cryptocurrencies into interest-earning accounts. It also offers credit card and crypto trading services.

## JURISDICTION AND VENUE

4.      Plaintiff Alejandro Pinto is a citizen of Florida for the purpose of diversity jurisdiction under 28 U.S.C. § 1332.

5.      Defendant BlockFi Inc. is a citizen of New Jersey for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

6.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights). This Court also has supplementary concurrent jurisdiction over Plaintiff's

state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are related to the federal claims and arise from the same facts.

8.      Venue is proper in the Southern District of New York under 28 U.S.C. §1391(c) because, pursuant to the parties' employment agreement, Defendant submits to the exclusive personal jurisdiction of the federal and state courts located in New York in connection with its disputes with Plaintiff.

## FACTUAL BACKGROUND

Plaintiff Was Recruited to Work at Defendant BlockFi

9.      Plaintiff, Mr. Alejandro Pinto, is a 28-year-old Hispanic male.

10.     On or about October 26, 2020, Plaintiff was referred by a then colleague to speak with a recruiter, Mr. S, at BlockFi, which was at the time a small but quickly growing startup. On or about October 29 2020, Plaintiff interviewed with Mr. S, who convinced him to speak to the then Performance Marketing Team Lead, Mr. R, for an entry level job as a Performance Marketing Manager. At the time, Plaintiff had a senior and stable position at a Fortune 500 company leading the Performance Marketing team for its portfolio of Blockchain products, and was more than qualified for the open position at Defendant.

11.     On or about November 4, 2020, Plaintiff spoke with Mr. R, who was not only impressed by Plaintiff's experience and skills at executing the basic Performance Marketing job duties such as managing paid advertising campaigns, but also at Plaintiff's added experience and skills for setting up and working with processes and infrastructure for data reporting and analytics for marketing, which Defendant lacked at the time. Given Plaintiff's seniority and experience

3

working with these data processes and infrastructure, he would bring added value to the company beyond the skills required for the open position.

12.     During the conversation with Mr. R, Plaintiff asked specifically about diversity, equity, and inclusion at Defendant, given his awareness that a lack of racial and gender diversity could foster a toxic work environment. Mr. R reassured Plaintiff that this was not the case with the current marketing team at Defendant. Mr. R convinced Plaintiff that diversity was celebrated at Defendant, and that Plaintiff would have the opportunity to use his knowledge and skills to make critical contributions to the team. Plaintiff considered the chance to build the operational infrastructure for the Performance Marketing team to be a valuable experience and a challenge, so he agreed to interview with additional executive employees at Defendant outside of the Performance Marketing function.

13.     Between November 13, 2020 and November 16, 2020, Plaintiff spoke with four additional executive employees at Defendant: Director of Business Intelligence & Analytics, Mr. A; Creative Director, Mr. H; VP of Partnerships and Business Development, Mr. M; and Director of Marketing, Ms. S. At these meetings, Plaintiff discussed concrete ways in which he could not only perform the prescribed responsibilities for the open position, but also contribute to the growth of other groups at Defendant, including through: developing the data reporting and analytics infrastructure and processes; building processes for testing ad and brand creative designs; building processes for running ad campaigns in collaboration with existing business partners; and enhancing performance marketing with creative and business intelligence and analytics.

14.     On the same day of the last interview, Mr. S shared with Plaintiff the positive feedback from the interviews and communicated a verbal offer for Plaintiff to join Defendant as a

Growth Marketing Manager for the Performance Marketing team. Plaintiff received a formal offer on or about November 17, 2020, Plaintiff accepted the offer on or about November 18, 2020.

Plaintiff's Outstanding Performance at BlockFi

15.     On or about January 14 2021, Plaintiff began his employment at Defendant.

16.     His responsibilities included managing paid advertisement campaigns on existing channels and starting advertisements on new channels. This meant analyzing the performance of advertising campaigns and developing optimizations to improve the performance of those campaigns. He worked closely with Mr. A and his team of data scientists to pull and analyze marketing data and with Mr. R to make changes to the marketing campaigns accordingly.  He reported directly to the Director of Marketing, Ms. S.

17.     During the first first weeks of his employment, Plaintiff optimized existing advertising campaigns and drove a double digit percent increase in marketing efficiency. The existing marketing channels that Plaintiff managed drove customer acquisition conversions at a rate up to three times more efficient in Customer acquisition Cost (CAC)—a key performance indicator—than the benchmark set by the company. The total volume of Assets Under Management (AUM) driven by the marketing campaigns managed by Plaintiff generated significant revenue for Defendant.

18.     In addition to his regular responsibilities as the Growth Marketing Manager for the Performance Marketing team, Plaintiff also went above and beyond by collabing with other teams at the company and helping them grow. For example, Plaintiff established processes for working with the Creative and Design team to efficiently continue driving optimizations on existing advertising campaigns and to create ads. He also helped the Business Intelligence & Analytics

5

team to develop technology infrastructure for reporting and analyzing paid advertising campaigns, which provided critical insights into the profitability of the campaigns. Given Plaintiff's experience and technical skills, The Performance Marketing Team Lead, Mr. R, also suggested that Plaintiff work with the Customer Data Platform (CDP) team on automating execution of paid advertising campaigns, which again, Plaintiff took on.

19.     For the first four weeks of his employment, Plaintiff performed all responsibilities of his job effectively with positive feedback from leadership in the Marketing team, even receiving unprompted praises of his work from managers.

The Problematic Work Environment at BlockFi

20.     Plaintiff started work alongside Mr. T, who joined as the SVP of Growth and was in charge of overseeing the Marketing organization.

21.     From the start, Mr. T introduced cultures and behaviors that were detrimental to building an inclusive team. For example, he began arranging meetings on Friday during the workday and encouraged drinking at those meetings. He also started adding "walk on" songs during weekly calls with the entire Marketing team of 20 or so people. The song "Party Up," added by him to the playlist, was often played up to 3 times during meetings. The song is filled with homophobic lyrics, racial expletives, and references to violence towards women, such as "Y'all niggas remind me of a strip club, cause everytime You come around, it's like (what) I just gotta get my dick sucked" and "I'm tired of weak ass niggas whinin' over puss That don't belong to them, fuck is wrong with them? They fuck it up for real niggas like my mans and them Who get it on on the strength of the hands with them." He would even perform dance moves and try to get people in the meeting to go along with the song. As a result of Mr. T's behavior, the meetings felt unsafe and awkward for Plaintiff and other minority members of the team. These incidents left Plaintiff

with the impression that the company would be controlled by the male dominated "frat boy" culture often associated with technology startups, and confirmed by various polls such as the one by Norstat which states that nearly "74% entrepreneurs and investors say they have witnessed discrimination within the startup community."

Daniel Wright Began Employment at Defendant; Plaintiff Began Experiencing Discrimination in the Workplace

22.     On or around February 15 2021, Daniel Wright began working at Defendant as the Director of Performance Marketing. Wright is Caucasian. Wright's responsibilities included managing other Performance Marketing Managers, as well as managing certain marketing channels himself. Even though Wright was now Plaintiff's supervisor, neither Wright nor anyone else at Defendant ever communicated this with Plaintiff. Plaintiff discovered this reporting structure change by accessing the internal company system.

23.     From the start of Wright's supervision, Plaintiff felt that Wright and Mr. T discriminated against minorities, including Plaintiff, in the Marketing department.

24.     The discrimination by Wright and Mr. T against Plaintiff ranged from microaggressions to serious obstructions of Plaintiff's performance of his job functions. For example, Mr. T would mispronounce Plaintiff's name and speak to Plaintiff in Spanish during meetings even though Plaintiff is fluent in English and there was no need for the meetings to be in Spanish. Mr. T and Wright would regularly exclude minority employees from important meetings and conversations where decisions pertinent to Plaintiff's job duties were discussed and made. Mr. T and Wright frequently cut Plaintiff's speak time to share progress updates during allotted times at weekly meeting while giving preferential treatment to a white-presenting co-worker of Plaintiff by giving him more time to share updates during meetings, often times only allowing less than 5

minutes for Plaintiff to share work progress. This likely created the impression that Plaintiff's work was not important or substantive enough to be updated for leadership. Mr. Wright also forbade Plaintiff to communicate directly with members of the product team working on the Customer Data Platform (CDP), even though doing so was necessary for Plaintiff to effectively perform his job duties, and the product team had come directly to Plaintiff for his help due to delinquency by Wright.

25.     Other managers and leaders at BlockFi did not take actions in response to Mr. T and Wright's behaviors, despite the fact that they worked closely with them, including routinely being present at meetings where the discrimination occurred, and thus knew or should have known that Mr. T and Wright were exhibiting discriminatory behaviors.

26.     On or around February 24 2021, Plaintiff experienced yet another blatant act of discrimination when he and other minority employees were left out of acknowledgements of their work during a meeting with all members of the marketing organization. Wright, responsible for representing the Performance Marketing team during this meeting, focused only on celebrating the work of a white-presenting employee while excluding contributions from minority team members, even though the monetary value contributed to the company by the minority employees was higher than that of the person he was celebrating. Given this was yet another example of discrimination in less than two weeks, Plaintiff decided to confront Wright over a Slack direct message. In the message, Plaintiff noted that Wright should not have left out his work from the presentation to the broader organization, and alluded to Wright's implicit bias by stating "if there is something unspoken here I want to get ahead of it and fix it… it's probably implicit in your head… but I just want to make sure my name is also attached to the work we are doing." In a short off-handed reply,

Wright acknowledged that he should have given Plaintiff credit and then proceeded to ignore all work-related messages from Plaintiff afterwards.

27.     On or around February 25 2021, Plaintiff had a one-on-one conversation with Wright. Plaintiff expounded upon the Slack conversation, directly sharing with Wright his concerns about the microaggressions and how it could impact perception of Plaintiff's performance at the company despite positive quantitative measures. Wright became defensive about his actions, denying that there was bias in his actions. The conversation ended unsatisfactorily productive in addressing the issue, leaving Plaintiff worried that the discrimination would continue in the future.

28.     Around this time, Plaintiff started seeking mental health counseling due to increased stress and anxiety caused by this discrimination in the workplace.

29.     Despite the well documented phenomenon of biases and discrimination in the tech industry, Defendant had no notable training or policies on this issue.

Daniel Wright and Defendant Retaliated against Plaintiff

30.     Immediately after the confrontation regarding Wright's discrimination against Plaintiff and other minority employees, Wright began retaliating against Plaintiff in simple and complex ways.

31.     During daily team meetings with the Performance Marketing team, Wright began to embarrass Plaintiff by calling attention to and incessantly interrogating Plaintiff in front of other team members about "below benchmark performance" in "new exploratory marketing channels" even though the performance of "new exploratory marketing channels" that the white-presenting

team member on the team was managing was quantitatively performing worse than Plaintiff's, the other team member was never treated with this high level of scrutiny.

32.     Wright also forced Plaintiff to work on less profitable marketing channels for the business. Part of Plaintiff's responsibility as a Growth Marketing Manager is to explore new channels for profitability. One of the channels managed by the team was not proving profitable despite both Plaintiff and Wright working together to set up the marketing campaigns in this channel. Plaintiff communicated with Wright and others in leadership that he would slowly start testing alternative channels. One of these new channels tested by Plaintiff began to show evidence of being more efficient by orders of magnitude. Despite this, Wright forced Plaintiff to continue working on the less profitable channel, and told Plaintiff that his performance working with the new alternative channel was "low quality" despite the clearly documented evidence to the contrary. Wright even publicly reprimanded Plaintiff for testing the better-performing new channel, telling Plaintiff publicly that Plaintiff had not communicated he was spending budget on the new channel, even though Plaintiff had publicly posted about it in a group Slack discussion that Wright was a part of.

33.     Wright also used Plaintiff as a scapegoat for his own incompetence. Specifically, Wright pulled the wrong data for measuring the effectiveness of one of Plaintiff's marketing channels. As a result of this error, Plaintiff continued marketing campaigns that were in fact no longer effective but were erroneously showing up as effective under Wright's measures. When Plaintiff later discovered this issue and raised it with Wright, Wright acknowledged the error. Despite this, Wright later cited the performance of the channel as an example of Plaintiff's "poor performance," even though it was admittedly due to Wright's own mistake.

34.     In or around late March, Wright further retaliated against Plaintiff by disallowing a fair performance review through the company's standard process. Under company policies, all employees receive "360 performance reviews," which include soliciting feedback from peers and other supervisors across the company to give a fair and full account of their performance. Policies also permit employees to request a reasonable postponement of the review if the employee joined the company recently or if their direct supervisors are unavailable. In line with these policies, Plaintiff requested that his review be postponed, given that Wright had only been his direct manager for a few weeks, and because the Performance Marketing Team Lead, Mr. R, who Plaintiff had worked closely with, was out of office and therefore unable to give Plaintiff a peer review. Wright denied this simple request.

35.     In early April, 2021, before the review process was completed, Plaintiff sensed that his employment was at risk due to the negative perception of his performance fueled by Wright's publicly high scrutiny of his work. Plaintiff also noticed a posting for his exact position on the company job board. On or around April 06, 2021, in a one-on-one meeting, Plaintiff asked Wright directly whether his employment at Defendant BlockFi was at risk, and if so, what steps could be taken to rectify the situation, such as a performance improvement plan common at many companies. To this ask, Wright off-handedly and cryptically replied that "everyone is always in danger of being fired."

36.     On April 9, 2021, Plaintiff was terminated without any prior warning or notice. During a regularly scheduled meeting with Wright to discuss progress updates, the SVP of Growth, Mr. T, and an HR representative, Ms. C, showed up unexpectedly, and explained to Plaintiff that he was being let go due to his "low performance." Plaintiff was even patronized by Mr. T by being told he was being "hand held" by having daily check-ins with Wright even though it was a mutual

11

agreement between Plaintiff and Wright to work closely on a project together for a few weeks. During this meeting, Plaintiff connected the termination to the recent increased undue high scrutiny of his work and asked if the termination was related to his discrimination complaint. Mr. T and Ms. C did not answer. Soon after the meeting, within an hour or so, all access to Plaintiff's company accounts was locked, not even giving Plaintiff the opportunity to transition work to other team members.

37.    Later that day, Ms. C emailed Plaintiff a severance package that included two months of salary, under the condition that Plaintiff would waive his right to any claim against the company, including specifically discrimination claims under federal, state, and local law. The same email also mentioned that Ms. C had "raised to [VP of People, Ms. C]'s attention that you raised concerns of discriminatory treatment during our conversation this morning" and that Ms. C would be following up with Plaintiff directly regarding this.

38.    Plaintiff subsequently had one phone call with Ms. C but the conversation was unfruitful.

39.    Plaintiff did not accept the severance package.

40.    After being terminated unexpectedly, Plaintiff discussed with other minority employees working at BlockFi his experiences. Many of them expressed disbelief at Plaintiff's firing, given his solid performance and stellar reputation as a valuable team player. Several of them also expressed feeling uncomfortable with the culture in the Marketing team after the new SVP of Growth, Mr. T, began employment at the company.

41.    Defendant's discrimination and retaliation have caused Plaintiff lost income, lost career advancement opportunities, and significant emotional distress.

## EXHAUSTION OF ADMINISTRATIVE REMEDY

42.     On July 20, 2021, Mr. Pinto filed a charge of discrimination against BlockFi Inc. with the New York Department of Human Rights and the Equal Employment Opportunity Commission ("**EEOC**"). Ex. A. On September 1, 2021, the EEOC issued a right-to-sue letter stating that the Commission would not proceed further with its investigation, and made no findings as to the merits of the claims. Ex. B. This suit has been timely filed within 90 days of receipt of said right-to-sue letter.

## CAUSES OF ACTION

I.     **Employment Discrimination on the Basis of Race in Violation of Title VII, 42 U.S.C. §2000e-2(a) (1)**

43.     Plaintiff realleges and incorporates herein the other paragraphs contained in this Complaint.

44.     Title VII prohibits covered employers from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment" because of, among other considerations, an individual's race. 42 U.S.C.A. § 2000e–2.

45.     Here, Defendant discriminated against Plaintiff in violation of Title VII under both theories of disparate treatment and disparate impact.

### a. Disparate Treatment

46.     Plaintiff is a Hispanic male, and is thus a member of a protected class.

47.     Plaintiff was qualified for the position he held, and performed his responsibilities satisfactorily. This is supported by the facts that:

13

    a.  Plaintiff had significant experience in marketing prior to joining Defendant;

    b.  Plaintiff interviewed with five managers at Defendant before receiving the employment offer;

    c.  Plaintiff received positive feedback immediately after his job interviews;

    d.  During the first first weeks of his employment, Plaintiff optimized existing advertising campaigns and drove a double digit percent increase in marketing efficiency;

    e.  Plaintiff met and exceeded performance benchmarks set by Defendant;

    f.  Plaintiff received positive feedback, including unprompted praises, from multiple managers at the company;

    g.  Plaintiff went beyond his designated responsibilities by helping other groups in the company.

48.    Defendant subjected Plaintiff to adverse employment actions. This is evidenced by the facts that:

    a.  Mr. T would gratuitously speak to Plaintiff in Spanish and mispronounce Plaintiff's name;

    b.  Mr. T often played the song "Party Up" at team meetings, which contained homophobic lyrics, racial expletives, and references to violence towards women;

14

c.  Mr. T and Wright would regularly exclude minority employees, including Plaintiff, from important meetings and conversations where decisions pertinent to Plaintiff's job duties were discussed and made;

d.  Mr. T and Wright frequently cut Plaintiff's speaking time for progress updates during team meetings;

e.  Mr. Wright also forbade Plaintiff to communicate directly with members of another team, even though it was necessary for Plaintiff's job, and the members of that team reached out directly to Plaintiff for help;

f.  On or around February 24 2021, Plaintiff and other minority employees were left out of acknowledgements of their work during a meeting with all members of the marketing organization—Wright later admitted to the omission.

g.  After Plaintiff confronted Wright about the omission, Wright ignored all work-related messages from Plaintiff afterwards;

h.  After the confrontation, Wright began retaliating against Plaintiff, by embarrassing and interrogating Plaintiff in front of co-workers; subjecting Plaintiff's work to unduly high scrutiny; forcing Plaintiff to work on less profitable marketing channels; blaming Plaintiff for his own error; rejecting Plaintiff's reasonable and valid request to postpone a performance review; causing Plaintiff to be terminated under dubious pretext.

49.  White-presenting employees at BlockFi who were similarly situated as Plaintiff were treated more favorably. This is evidenced by the facts that:

a.  Wright criticized the performance of marketing channels under Plaintiff's management, even though the white-presenting co-worker of Plaintiff had objectively measurably worse performing channels but did not receive criticism;

b.  Mr. T and Wright frequently gave more speak time to a white-presenting co-worker of Plaintiff at team meetings, even though both Plaintiff and the co-worker were presenting on comparable topics;

c.  Wright celebrated the work of a white-presenting employee while excluding contributions from minority team members, including Plaintiff, even though the profits driven by the minority employees were measurably higher.

50.     The circumstances surrounding Defendant's adverse employment action give rise a strong inference of intentional discrimination motivated by animus, because:

a.  Mr. T would gratuitously speak to Plaintiff in Spanish and mispronounce his name, indicating Mr. T's intent to alienate Plaintiff at the workplace;

b.  Mr. T often played a song with racial expletives at team meetings with minority employees, including Plaintiff, sometimes multiple times in a row, indicating his intent to provoke discomfort;

c.  The fact that Mr. T and Wright regularly excluded minority employees, including Plaintiff, from important meetings, gives rise to a strong inference of intentional discrmination;

d.  The fact that Mr. T and Wright frequently cut Plaintiff's speaking time at team meetings while giving a white-presenting employee more time to present on comparable topics gives rise to a strong inference of intentional discrmination;

e.  The fact that Wright would omit the contribution of minority employees while highlighting the work of white-presenting a employee, which he later admitted he should not have done, gives rise to a strong inference of intentional discrmination;

f.  There is no plausible motivation, other than animus, for Wright to criticize the performance of Plaintiff's marketing channels, when the channels of a comparable white-presenting employee were performing measurably worse but received no criticism;

g.  Wright immediately retaliated against Plaintiff in various harsh manners after Plaintiff complained about discrimination, including eventually causing Plaintfiff to be fired—his series of actions cannot be explained by any motivation other than intentional malice.

51.    Defendant's discrimination has directly and proximately caused Plaintiff damages, including lost income, lost career advancement opportunities, and significant emotional distress.

52.    Defendants' unlawful actions constitute malicious, willful and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

**b.  Disparate Impact**

53.    Defendant engaged in the practice of fostering and encouraging a work environment detrimental to minority employees. This is evidenced by the facts that:

17

     a.  Mr. T and Wright, managers at Defendant, exhibited discriminatory behavior towards minority employees;

     b.  No leadership manager or HR personnel addressed or rectified the intolerant work environment despite clear signs of its presence;

     c.  Despite having a facially neutral performance measurement system, minority employees were recognized much less often than white employees, resulting in less advance opportunities and higher attrition rate among minority employees;

54.    Defendant's practice had a disparate impact on the employment of minority employees. This is evidenced by the facts that:

     a.  Minority employees were regularly excluded from important team meetings;

     b.  Minority employees were recognized less frequently for their contributions;

     c.  Minority employees suffered from serious attrition;

55.    The causal connection between Defendant's practice and the disparate impact is clear, because the exclusion and alienation of minority employees could only have resulted from a systemic culture of the company that permeates decision making at every level of leadership, whether conscious or not.

56.    As a result of the disparate impact caused by Defendant's practice, Plaintiff and other minority employees at BlockFi have suffered damages, including lost income, lost career advancement opportunities, and emotional distress.

II.     **Retaliation for Complaints of Race Discrimination in Violation of Title VII, 42**
        **U.S.C. §2000e-3(a)**

57.     Plaintiff realleges and incorporates herein the other paragraphs contained in this
Complaint.

58.     Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-
3(a) provides that it shall be an unlawful employment practice for an employer: "(1) to…
discriminate against any of his employees… because he has opposed any practice made an
unlawful employment practice by this subchapter, or because he has made a charge, testifies,
assisted, or participated in any matter in an investigation, proceeding, or hearing under this
subchapter." To succeed on a retaliation claim, a plaintiff need not prove that the conduct they
opposed was actually discriminatory or illegal, as long as they had a reasonable, good faith belief
that the conduct was illegal.

59.     Here, Plaintiff engaged in an activity protected under the statute when he
complained of discrimination by first messaging Wright via Slack and then having a one-on-one
conversation with Wright to share his concerns.

60.     Immediately after, Wright took a series of adverse employment actions against
Plaintiff. These actions include:

      a.  Ignoring Plaintiff's work-related messages;

      b.  Embarrassing and interrogating Plaintiff in front of his co-workers;

      c.  Subjecting Plaintiff's work to unduly high scrutiny and harsh criticism;

      d.  Forcing Plaintiff to work on less profitable marketing channels;

      e.  Blaming Plaintiff for Wright's own mistake;

f.  Rejecting Plaintiff's reasonable and valid request to postpone a performance review;

g.  Ultimately causing Plaintiff to be discharged under the false pretext of "low performance."

61.     A reasonable employee could consider these actions to be materially adverse and likely to deter them from engaging in protected activities. This is because any of these above listed actions could have a serious negative impact on the employee's performance or the public perception of their performance, leading to more obstacles to the employee's advancement at the company.

62.     It is evident that Defendant took such adverse actions against Plaintiff as a direct result of Plaintiff's protected activity. It is clear that Plaintiff's protected conduct was the determinative factor in Defendant's adverse action, because:

a.  Wright's retaliation followed immediately after Plaintiff's complaint: the increased criticism, embarrassment, interrogation, and undue scrutiny began within days of Plaintiff's first complaint; the forcing of Plaintiff to less profitable work, scapegoating, and rejection of Plaintiff's valid request followed within the next month or so; and Plaintiff was fired in about a month and half after his complaint.

b.  Wright and Defendant had no valid business justification for the retaliatory actions taken against Plaintiff; their pretextual justification of "low performance" can be easily rebutted, since Plaintiff was performing at or above expectation as measured by quantifiable benchmarks set by the company, and

since there had been no other complaints by others of any performance issue by
Plaintiff;

c.  Wright and Defendant never listened to Plaintiff's side of the story, or gave him
a chance to rectify any "low performance" issue;

d.  On April 9, 2021, after Plaintiff asked whether his termination was related to
his discrimination complaint, his computer access was shut down within the
next hour or so.

63.     Defendant's discrimination has directly and proximately caused Plaintiff damages,
including lost income, lost career advancement opportunities, and significant emotional distress.

64.     Defendants' unlawful actions constitute malicious, willful and wanton violations of
Title VII, for which Plaintiff is entitled to an award of punitive damages.

**III.    Race Discrimination in Violation of 42 U.S.C. § 1981**

65.     Plaintiff realleges and incorporates herein the other paragraphs contained in this
Complaint.

66.     Section 1981 grants all individuals within the jurisdiction of the United States the
same rights to make and enforce contracts as "enjoyed by white citizens," including in employment
relationships. 42 U.S.C. § 1981.

67.     The foregoing facts and circumstances demonstrate that Defendant has violated
Section 1981 by discriminating against Plaintiff on the basis of his race, including by treating him
less favorably than similarly situated white-presenting employee. Plaintiff's race was the direct
and proximate cause of Defendant's discrimination against him.

68.     Defendant's discrimination has directly and proximately caused Plaintiff damages, including lost income, lost career advancement opportunities, and significant emotional distress.

69.     Defendants' unlawful actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**IV.     Retaliation for Complaints of Race Discrimination in Violation of 42 U.S.C. § 1981**

70.     Plaintiff realleges and incorporates herein the other paragraphs contained in this Complaint.

71.     42 U.S.C. § 1981 prohibits employers from retaliating against employees for engaging in a protected activity of complaining about unlawful discrimination at the workpalce. The analysis of retaliation claims under 42 U.S.C. § 1981 is the same as under Title VII.

72.     The foregoing facts and circumstances demonstrate that Defendant has violated Section 1981 by retaliating against Plaintiff immediately after Plaintiff complained about discrimination at Defendant. Defendant had no valid business justification for the retaliatory actions taken against Plaintiff following his engagement in protected activity, and Plaintiff's complaint is the direct and proximate cause of Defendant's adverse employment actions.

73.     Defendant's discrimination has directly and proximately caused Plaintiff damages, including lost income, lost career advancement opportunities, and significant emotional distress.

74.     Defendants' unlawful actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

22

V.    **Racial Discrimination in Violation of New York State Human Rights Law, Article 15, § 296**

75.    Plaintiff realleges and incorporates herein the other paragraphs contained in this Complaint.

76.    NYS HRL prohibits employers from discriminating against individuals on the basis of race. N.Y. Executive Law § 296.

77.    The foregoing facts and circumstances demonstrate that Defendant has violated NYS HRL by discriminating against Plaintiff on the basis of his race, including by treating him less favorably than similarly situated white-presenting employee. Plaintiff's race was the direct and proximate cause of Defendant's discrimination against him.

78.    Defendant's discrimination has directly and proximately caused Plaintiff damages, including lost income, lost career advancement opportunities, and significant emotional distress.

79.    Defendants' unlawful actions constitute malicious, willful and wanton violations of NYS HRL, for which Plaintiff is entitled to an award of punitive damages.

VI.    **Retaliation in Violation of New York State Human Rights Law, Article 15, § 296**

80.    Plaintiff realleges and incorporates herein the other paragraphs contained in this Complaint.

81.    The New York State Human Rights Law prohibits employers from discharging, expelling or otherwise discriminating against a person because they have opposed any discriminatory practice. N.Y. Executive Law § 296.

82.    The foregoing facts and circumstances demonstrate that Defendant has violated NYS HRL by retaliating against Plaintiff immediately after Plaintiff complained about

discrimination at Defendant. Defendant had no valid business justification for the retaliatory actions taken against Plaintiff following his engagement in protected activity, and Plaintiff's complaint is the direct and proximate cause of Defendant's adverse employment actions.

83.     Defendant's discrimination has directly and proximately caused Plaintiff damages, including lost income, lost career advancement opportunities, and significant emotional distress.

84.     Defendants' unlawful actions constitute malicious, willful and wanton violations of NYS HRL, for which Plaintiff is entitled to an award of punitive damages.

## VII.   Racial Discrimination in Violation of New York City Human Rights Law, N.Y.C Admin. Code § 8-101 *et seq.*

85. Plaintiff realleges and incorporates herein the other paragraphs contained in this Complaint.

86. NYC HRL prohibits employers from discriminating against an employee on the basis of race. N.Y.C Admin Code § 8-107.

87. The foregoing facts and circumstances demonstrate that Defendant has violated NYC HRL by discriminating against Plaintiff on the basis of his race, including by treating him less favorably than similarly situated white-presenting employee. Plaintiff's race was the direct and proximate cause of Defendant's discrimination against him.

88. Defendant's discrimination has directly and proximately caused Plaintiff damages, including lost income, lost career advancement opportunities, and significant emotional distress.

89. Defendants' unlawful actions constitute malicious, willful and wanton violations of NYC HRL, for which Plaintiff is entitled to an award of punitive damages.

**VIII.   Retaliation in Violation of New York City Human Rights Law, N.Y.C Admin. Code § 8-101** *et seq.*

90.      Plaintiff realleges and incorporates herein the other paragraphs contained in this Complaint.

91.      NYC HRL prohibits employers from retaliating against an employee for opposing practices that violate this chapter of the NYC HRL. N.Y.C Admin Code § 8-107.

92.      The foregoing facts and circumstances demonstrate that Defendant has violated NYC HRL by retaliating against Plaintiff immediately after Plaintiff complained about discrimination at Defendant. Defendant had no valid business justification for the retaliatory actions taken against Plaintiff following his engagement in protected activity, and Plaintiff's complaint is the direct and proximate cause of Defendant's adverse employment actions.

93.      Defendant's discrimination has directly and proximately caused Plaintiff damages, including lost income, lost career advancement opportunities, and significant emotional distress.

94.      Defendants' unlawful actions constitute malicious, willful and wanton violations of NYC HRL, for which Plaintiff is entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

95.     Plaintiff asks the Court to enter judgment in his favor on all counts, and to award Plaintiff:

   a.   Specific performance by Defendant to:

   i.   Institute mandatory Diversity, Equity, Inclusion and Accessibility (DEIA) training for employees, especially for managers, to learn about microaggressions, ableism, culturally sensitive language, and other introductory concepts important to inclusive workplaces;

   ii.  Put in place a process for accountability towards maintaining an inclusive workplace by having an action plan for having diverse representation in the company, especially in leadership roles that is reflective of the diversity of people of all colors across the United States;

   iii. Put in place a clear, simple and widely promoted process for employees to safely reporte discrimination and harassment in the workplace;

   b.   Compensatory damages of no less than $120,000;

   c.   Damages for lost wages and benefits, back pay, front pay (or reinstatement);

   d.   Damages for humiliation, mental and emotional distress;

   e.   Punitive damages;

   f.   Attorneys' fees and costs of suit;

   g.   Lawful interest, including pre- and post- judgment interest on lost wages;

   h.   Other, further and different relief as the Court deems fitting, just and proper.

## **JURY DEMAND**

96.     Plaintiff hereby demands a trial by jury of this action.


Dated:  Boca Raton, Florida
        November 26, 2021

                                          Respectfully submitted,


                                          Alejandro Pinto
                                          PO Box 811512
                                          Boca Raton, Florida 33481-1512
                                          (561) 365-8936
                                          alej.xyz1@gmail.com

# Exhibit A

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| | ___ FEPA<br>_X_ EEOC | |

_____ and EEOC
*State or local Agency, if any*

| Name (*indicate Mr. Ms. Mrs.*) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Alejandro Pinto | (561) 715-5058 | July 2,1993 |

| Street Address | City, State and ZIP Code |
|---|---|
| 2731 Timbercreek Circle NW | Boca Raton, Florida 33431 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others.  (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| BlockFi Inc. | Approx. 500 | (646) 779-9688 |

| Street Address | City, State and ZIP Code |
|---|---|
| 201 Montgomery Street, #263 | Jersey City, NJ 07302 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (*Check appropriate box(es).*) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| _X_ RACE  __ COLOR  __SEX __ RELIGION  __ NATIONAL ORIGIN<br><br>_X_RETALIATION  __ AGE  __ DISABILITY  __ OTHER (Specify below.) | Earliest – **February 2021**<br>Latest – **April 9, 2021**<br><br>__ CONTINUING ACTION |

THE PARTICULARS ARE (*If additional paper is needed, attached extra sheet(s)*):

**SEE ATTACHED NARRATIVE** - *(3 pages)*

I want this charge filed with the EEOC.  I will advise the agency if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

7/20/2021
_____
*Date*

DocuSigned by:
*Alejandro Pinto*
*Charging Party Signature*

DocuSign Envelope ID: 2AAAD21F-395C-400C-BAF1-769795F39307

JOSEPH & KIRSCHENBAUM LLP
Attorneys at Law

| | |
|---|---|
| Charles Joseph | 32 Broadway, Suite 601 |
| D. Maimon Kirschenbaum | New York, NY 10004 |
| Denise Schulman | Phone (212) 688-5640 |
| Josef Nussbaum | Fax (212) 688-2548 |
| Lucas C. Buzzard | www.jk-llp.com |
| Leah Seliger | |
| Mike DiGiulio | |

## Alejandro Pinto v. BlockFi Inc.
### EEOC Charge – Extra Sheets

1.      I am a Hispanic male. I began working for BlockFi Inc. on January 14, 2021 as a Manager of Performance Marketing. BlockFi Inc. provides consumer financing services. The Company offers loans to cryptocurrency owners who collateralize the loan with their crypto assets. BlockFi provides risk management, financial technology, and digital financing solutions. BlockFi serves customers worldwide.

2.      While at BlockFi I received praise and positive feedback for my work from my dotted line manager and executives at the company. I worked at BlockFi without incident until mid-February 2021, when Daniel Wright became my direct supervisor

3.      Daniel Wright is Director of Performance Marketing at BlockFi. Mr. Wright is Caucasian.

4.      From the beginning of Mr. Wright's supervision, I felt that he discriminated against minorities, including myself, within the department.

5.      I did not see other managers or leaders at BlockFi take actions against Mr. Wright's discriminatory behaviors, despite the fact that they worked closely with him, including routinely being present at meetings where the discrimination occurred.

6.      On February 24, 2021, I confronted Mr. Wright about his discrimination. I told Mr. Wright that he mistreated minority employees through repeated microaggressions; including:

DocuSign Envelope ID: 2AAAD21F-395C-400C-BAF1-769795F39307

leaving minority employees off of important projects, failing to acknowledge the contributions of minority employees, and increased scrutiny of minority employees' work.

7.      Mr. Wright wasted no time retaliating against me.

8.      Almost immediately after I complained about the discrimination, Mr. Wright began publicly embarrassing me during meetings with high scrutiny and criticism of my work. However, I was a solid performer. In fact, my performance was on par and at times substantially above other staff members who also attended these meetings, yet they did not receive the same harsh treatment from Mr. Wright. I felt that his critiques were subjective and unjustified, thus I began to worry that this would negatively impact my performance reviews.

9.      During this time, I began seeing a therapist to cope with the extreme mental anguish Mr. Wright's behavior was causing me.

10.      In March, in line with company policy, I requested that my standard performance review, which includes feedback from peers and other supervisors, be postponed. I made this request because Mr. Wright had only been my manager for approximately one month and the team lead who I had worked closely with was out of the office. Nonetheless, Mr. Wright blocked my request.

11.      This harassment continued until April 9, 2021, when the Senior VP of Marketing (in the company of Mr. Wright and Human Resources) summarily terminated me for "performance reasons." I was not given an opportunity to explain or rectify any such alleged issues. It is my belief that Mr. Wright's biased narrative was the sole reason BlockFi terminated my employment.

12.      I left a high paying job at a Fortune-500 company to commence work at BlockFi. My work was excellent. The timing of Mr. Wright's campaign against me, Mr. Wright's immediate

A. Pinto – EEOC Narrative

retaliation against me, and the vague reasoning for my termination all indicate that I was terminated in retaliation for my protected activity.

     13.    BlockFi and Mr. Wright's retaliation has caused me lost income, lost career advancement opportunities, and significant emotional distress.

3

A.  Pinto – EEOC Narrative

# Exhibit B

EEOC Form 161 (11/2020)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To:  **Alejandro Pinto**
**2731 Timbercreek Circle Nw**
**Boca Raton, FL 33431**

From:  **New York District Office**
**33 Whitehall Street**
**5th Floor**
**New York, NY 10004**

| | |
|---|---|
| ☐ | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2021-04024** | **Silvia Y. Deng-Batista,** **Investigator** | **(929) 506-5271** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

ARLEAN NIETO

Digitally signed by ARLEAN NIETO
Date: 2021.09.01 14:23:41 -04'00'

Enclosures(s)

**Judy A. Keenan,**
**District Director**

*(Date Issued)*

cc:  **Attn**
**Director of Human Resources**
**BLOCKFI INC.**
**201 Montgomery Street,**
**#263,**
**Jersey City, NJ 07302**

**Maimon Kirschenbaum, Esq.**
**JOSEPH & KIRSCHENBAUM LLP**
**32 Broadway,**
**Suite 601,**
**New York, NY 10004**

Enclosure with EEOC
Form 161 (11/2020)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**.   Therefore, you should **keep a record of this date**.   Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.   If you intend to consult an attorney, you should do so promptly.   Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it.   Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *issued* to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.   (Usually, the appropriate State court is the general civil trial court.)   Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.   Filing this Notice is not enough.   You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.   Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.   Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.   If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.   For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.   This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.   Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.   Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).   Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.   If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).   While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.   Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**.   (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*